The next case we'll hear today is United States v. Marfo and Mr. McPherson, when you're ready, you can proceed. Good morning, Kenneth McPherson here with Mr. Gregory Gardner. On behalf of Mr. Marfo, may it please the Court. In the government's response brief on page 24, the government says, and I quote, On October 14, 2011, in the face of a continuing federal investigation, Davis met with Attorney Murphy for the purpose of obtaining legal advice about possible federal fraud and murder charges. That is a concession that as of at least that date, that Mr. Davis had a motive to say, to fabricate a story. In this instance, we contend that that motive actually started several months earlier, back in June and July, when he got a call from You're arguing that he visited the lawyer, not from an exposure to liability, but in order to stage some testimony that he was going to give under Rule 801, and that he knew in advance that he needed to have buttressing evidence that would later be used in a court of law under 801? Yes. I don't think most law students understand that. Well, actually, I don't think most anyone else would be that conniving. I don't think they're knowledgeable. You need about ten steps of knowledge to know that, first of all, you're going to testify, you're going to cooperate, you're going to use the attorney, you're going to waive your attorney-client privilege, you're going to testify at trial, and you're going to want to buttress that with the statements you made to your attorney earlier under Rule 801 D1B. You had to know all of that to make it meaningful. Well, he needs to know some of that. The first thing, all he needs to know from visiting attorney Catherine Flynn in June or July 2011, or one of the other attorneys he visited before he went to attorney Murphy, all he had to know at that point was that since I am at the top of the heap, or it appears that I'm at the top of the heap, I have to have something to trade. Now, that thing to trade would be MARFO. Problem is, I know that I'm not going to be very convincing, because all of the direct evidence, and frankly, the circumstantial evidence- You say Murphy's doing, making all these considerations? This man, yes, he already demonstrated a propensity to use lawyers, Larry Feldman, for something other than legal services. He had demonstrated himself as someone who could envision what would happen in the future and how he could use people to manipulate those events in the future. So when he goes to attorney Murphy, all he needs to know at that juncture is that I need to have someone to trade, and I have to be believable. So when he goes to see attorney Murphy, all he has to do is say MARFO's involved. Then, three weeks later when he's arrested and he is flipped, he has to prove that he's someone worthwhile to be flipped, someone who can be believed in court. He has innumerable things he can be impeached with, and he is- all the direct evidence leads to him. So he has to have someone to say, I've been saying this all along. Now, if he had never gone to Catherine Flynn, if he had never gone to any other attorneys, if he had never demonstrated an ability to use a lawyer for something other than legal services, if he was someone of less cunning, then your question to me, Judge, would be an easy answer. But in the brief- I must say that I consider myself to have a little bit of knowledge about hearsay and buttressing and pretrial consistent statements and that type of thing. I would never figure that out or anticipate that. I mean, it's so remote, all the possibilities and contingencies and all the testimonies. Well, that's- You make a- That's where- You give him a lot of credit. I'm not the only one. Trial counsel perceived it the same- John Griffin could probably put one of those in his book. Well, let me tell you, yes. Yes, it is fascinating. It's enlightening. But in application of the rule, all you do is look, when did the motive exist? And the government has conceded that it existed at the time Davis went to Murphy. For you to say, I think that that's far-fetched, perhaps, but that doesn't change the application of the rule. So we do have a situation where the trial judge permitted into evidence these prior consistent statements that should not have been entered into evidence. Then you're going to look at, what's the harm? Well, really, you have from May 22, 2011 to November 9, 2011, you have Davis being recorded hundreds of hours by Mr. Copeland. Never says anything about Marfell. Let me ask you this. I'm not sure this was sufficiently preserved, given what the district court did, instructions the district court gave with reference to that. And even if it was error, tell me how it survives plain error analysis under the fourth prong of Allana. And the second question is, didn't the defendant invite this, and such the error was invited by the defendant? May I do them in reverse? Sure. It was not invited. Mr. Davis was cross-examined about his failure to ever mention Marfell during hundreds of hours of tapes to Mr. Copeland. He was also cross-examined about the fact that Bird, that Marfell had never met Bird, that Marfell had only met Callaway once in Copeland. He was cross-examined on a lot of things, but I guess the relevant one is, he was cross-examined about his failure to mention Marfell previously. So that opens, that does not open the door to bringing someone in just to repeat what he said at trial. That's pure cooperation. It can only come in if he didn't have a motive. I kind of lost track of what I was going to say a few moments ago. In terms of plain air, it does affect the appellant's substantial rights. It is incredibly prejudicial. As I started to say, Judge Niemeyer... Well, you had the testimony of Davis, didn't you? Pardon me? You had the direct testimony of Davis in court that implicated him. All this did was to corroborate what he had said to his attorney out of court. But you still have the direct testimony that the jury apparently believed, and it was explained that he would lose the benefits of his deal if he didn't testify truthfully. They made that judgment. Well, they made that judgment with the benefit of Murphy, who was a Navy veteran, who's an ex-U.S. prosecutor, who was vouching for the integrity of the prosecutor, saying... Well, I thought we were back at the question that Judge Hamilton raised with respect to the 801D. He said that, why should we notice the error? How's the prejudice? And I'm just following up on that and saying, it was nothing more than corroborative of testimony that was before the jury, and the jury was apparently believing Davis. Well, but from a fact-specific standpoint, Davis has no independent credibility at all. There was no forensic... Yeah, but we can't decide that here. We're an appellate court. The jury made that decision. Then it becomes an easy question. Is Davis more likely to be believed by the jury when what he says is corroborated by Attorney Murphy, who was unassailable in his credibility? And the answer to that is, resoundingly, yes. This was not just a witness from a street who saw a murder and who's brought in and may have a little credibility issue because he was having a couple beers that night. This man, Davis, was the mastermind of the large fraud, and then he conceived, he hired, he arranged for the murder, he gets rid of the murder weapon. He was the one... He conceded all that. He conceded all that in detail. So the question is, is he a believable person? And what did the government have to show that he's a believable person? Nothing except Murphy, and that's why it is plein air. Why would it be unbelievable when he is told, tell the truth, you'll get 35 years, and he then goes in detail and implicates all himself in, exactly as you described it. It was quite remarkable how detailed and clear his testimony about his own involvement was. He's already recorded as saying he was involved. It's nothing for him. I know, but he explained the details and made it rational, and the fact that he said the same thing to his lawyer when he first saw him... To one of his lawyers. By the way, that's one of the issues. He waived the attorney-client with respect to Murphy. There's the issue of subject matter waiver. The court should not have allowed Murphy to testify on this waiver without first deciding whether or not Murphy... whether or not Davis had waived his privilege with respect to the other lawyers. Because as you sit here and ask... So is this argued in your brief? No, no, but I think it's a subset of the argument, if you will. When Judge Niemeyer says, well, can't we... You argue it in the district court? No, it was not argued by trial counsel. So this is the first time. Well, actually, trial counsel brought it up, and Judge Garbus said, I'm not going to make a determination now whether or not it's been waived by the others. And then trial counsel didn't bring it up again. But Judge Niemeyer, with all due respect, you are operating from the premise that Murphy had not already received the information from Attorney Flynn and others that would allow him to conceive that very conniving plan to lay out all those events that you describe as being doubtful, as being, or as government says, fanciful. But that's because we don't know what he learned from Flynn. But we know that when Davis went to Flynn, he went to her because homicide detectives wanted to talk to her. So we have the motive to lie back in July of 2011. The government concedes it existed before he went to Davis. So what happens is, as you said, in U.S. v. Hedgepeth, you have to follow Toomey. And if it's not the very same statement for completeness, then there's no other purpose it can be used. You have to rely on Rule 801 D1B. And when the government concedes, then we get down to plain error, as Judge Hamilton asked me, what is that? Well, this was a weak case. Murph, Davis recorded Marfo for hours, and Marfo said nothing except, uh-huh. Which, as I point out footnote in a brief, can mean, yes, I agree with you, or it can mean, yeah, I'm listening to you. He was convicted on an uh-huh, and Davis, but trust my attorney, Murph. All right, thank you, Mr. McPherson. Mr. Purcell? I thought that might go a bit longer. Good morning, Your Honors. My name is John Purcell. I was the prosecutor in this case. First, a couple of factual corrections. There were not hundreds of hours of tapes between Mr. Copeland and Mr. Davis. Can you move a little closer to the mic?  There were about 20 hours of tapes between Mr. Copeland and Mr. Davis. There were about 20 hours of recordings between Mr. Copeland and Davis. And to add to the, and by the way, in all of those conversations, from the very beginning, the first occurred on May 22nd, just about a month after the murder itself of this young man. From the very beginning, when Davis was talking to Copeland, and we remember that Copeland came to the government, explained he was part of the fraud, we became a federal witness in a day the first day he came in. And his statement, by the way, that he wasn't involved in the murder was never contradicted by anyone, including Davis, this conniving Davis, who would have had every opportunity and motive to implicate Copeland or further implicate MARFO, never did that. But in all of those early conversations between Copeland and Davis, Davis was continually implicating MARFO, who he called, that was the references to Money Order Boy. The focus of all those conversations and the purpose of the long investigation was to identify, finally identify the trigger man who turned out to be Byrd. And that occurred coincidentally, or maybe not coincidentally, on October 14th, which was exactly the same day that Davis told Copeland in the morning, I'm gonna go off and see this lawyer this afternoon, and then went to that lawyer's meeting that was with Mr. Murphy. He took MARFO with him, incidentally. Thinking they would both be able to speak with this attorney, but Mr. Murphy testified at trial that he wouldn't allow that, so MARFO, who identified in court, sat in the ante room. And then later after that meeting, after the meeting with Mr. Murphy, Davis came back to Copeland that same afternoon, October 14th, and had another recorded conversation. And that is the sort of infamous in the case, schmuck of the year, where he clearly, and this is how we knew to even approach Murphy in the first place, because it was very clear from this recorded conversation that he had told Murphy everything. He told him his role, he told him MARFO's role, he told him Byrd's role. And later in that conversation, he actually gave us identifying characteristics that allowed us to identify Byrd, arrest Davis a few weeks later, and then arrest Byrd that same day. The point is, having a motive to go to a lawyer is not the same thing to have a motive to fabricate. And the case is that, for instance, in Hedgepeth, the defendant there, a young woman, wanted to get in her post-arrest, self-serving statement to an FBI agent in her case. Wasn't permitted to do so, because after her arrest, she had a motive to fabricate. In this case, the facts and circumstances show that the court did not abuse his discretion, much less commit plain error in allowing the testimony here under 801 D1B. I would maybe say something differently if Davis hadn't incriminated himself more than he incriminated anybody else, both at trial and in talking to Mr. Murphy. We know this because Mr. Murphy told us that. And he actually, as was argued at the trial, and argued to the jury, Davis actually incriminated himself far more than he incriminated Murphy. I'm sorry, MARFO. And he could have done, I mean, he could have gone in there, if he was that conniving, I think he would have gone in there and implicated everybody but himself, if he was setting up some sort of future witness who was gonna testify for him. And beyond just that sort of not being able to be that conniving, because nobody could be, he would have had to actually know, that is, Davis, when he went to Murphy, would have had to know that Copeland was recording him all this time, and that he would have had to conform his statement made at that time without knowing that Copeland was cooperating and recording all of the statements. He would have had to made a statement that conformed with all those tapes, which he didn't know were being made, which is impossible. So this is a person who went to an attorney, why, for the reason people go to their attorneys. The alternative reason that we thought this was admissible, and the judge, I think because of the optics of the thing, it sort of sounds odd to put a lawyer in the position of being a person who is a witness to a declarant statement under 801 D2E. But one of our first theories, and we followed the memo before this, none of this was a surprise, the defense had an opportunity to interview counsels, Mr. Murphy as well, the judge knew this was coming, but we actually proposed admissibility under 801 D1B and 801 D2E, because I could not think of, to me, this is the epitome of a co-conspirator statement. It doesn't make the lawyer a co-conspirator, and of course he's privileged, but that's why there is an attorney privilege. That's why those sorts of statements to a lawyer are privileged, because otherwise they would be co-conspirator statements. Why else did he go to Murphy? He went to Murphy to find out how he survives the situation he's put himself into. There's, in my view, the epitome of an in-furtherance of the conspiracy statement. The court rejected that, and just wouldn't go there because of thinking about the privilege. We don't trigger who waives, the witness triggered it here, that is, after we asked him to do so. And we knew to go to Murphy, of course, because we had a tape between Davis and Murphy of that conversation that day. We knew. You asked Davis to waive the attorney client? We confronted Davis. Davis did not come forward and say, oh, and by the way, you can go check my lawyer. We, and I was about to say why, we knew, the investigators knew, that Davis had implicated himself to his attorney because he told our informant about 10 minutes after he got back from that meeting that he told them everything and learned what the circumstances were. So we knew that he had done this. When we asked him, he said, yeah, I told him the same thing I just told you, or I've been telling you, and that you have on my tapes that I now know about. And we went to Mr. Murphy, who was, as you would hope, completely unwilling to cooperate, but he did what he had to do when the waiver was presented, and he testified, and he told us what his client told him. There's no evidence anywhere in the record, by the way, of any communication between the prior attorney, Ms. Flynn, and Mr. Murphy. And beyond that, I might point out that we asked, and it's on the record, we asked Mr. Davis, what did he tell Ms. Flynn? And he told her the same thing. And there was a point when Mr. Papport was cross-examining Mr. Davis, and he said, well, what about Ms. Flynn? Because he'd said he'd given a waiver, and in his direct, he mentioned, yes, I gave a waiver to my lawyer, who will be probably testifying later. And Mr. Papport brought out, as he should have, well, you went to see Ms. Flynn, too, do you have a waiver for her? And he said, I'll be happy, he was prepared for that question. He said, yes, I'll be happy to sign a waiver for her. And he would have done so, but Mr. Murphy, Mr. Papport walked away from that question and never went there again because he realized this is not gonna get him anywhere. But the point is, this is a witness who, under the analysis of the case law, this is a person who does not yet have a motive to fabricate. Every case where there's a motive to fabricate, there's been an arrest. The person has been confronted with, he's been confronted with the police, and he's making self-serving statements. The hearsay rules understand that people make self-serving statements, and the idea is to prevent that sort of unreliable statement coming in. And I'm sure the court, all of you have read the Caracappa case from the Second Circuit, which is exactly the same thing, except we have the benefit of knowing that everything he told this lawyer is the same because A, the witness admitted himself, he incriminated himself, and we have lots of tapes that he didn't know that we had that prove that he said all these very same things before. Davis and Bird pled guilty before trial to what counts one and four? He pled, I don't actually remember what they were, they were two. Probably the 1958, the murder for hire count. And I think the murder of a witness count, yes. Well, count one was the conspiracy to use interstate communication facilities. And it would have been the two conspiracy counts, yes. Count four was charge of murder of a witness resulting in the death of Galloway. Yes. Both are mandatory life counts. And you know, he didn't pick the 35-year sentence. That was, that's not his business. That's what he was determined to be. Court could have rejected it. So in this particular case, the court, and this instruction we, there was some mention about, I wanted to mention the instruction that the court gave. The court didn't give a limiting instruction. It gave a cautionary instruction. And it gave it, actually, I thought the instruction, if you read the part of the transcript, just before Mr. Murphy takes the stand, we approach and the court actually asked me again, which had been a motion to eliminate, laying this all out, but the court said, now, once again, you're a theory for putting this witness on, Mr. Murphy. And I mentioned 801 D2E, which you sort of know. And then he said, well, I'll give the jury an instruction telling them that it's up to them. And the last thing he says is to them, so when you listen to what Mr. Murphy says, bear this in mind, that is, the whole argument about a motive to fabricate, that is, did this, did it precede or was it after a motive to fabricate? And you, the jury, will decide whether or not it supports Mr. Davis's testimony before you or it doesn't. And I wanted to bring that out because there's been an argument in the defense brief that the court didn't tell the jury how to consider this. Well, the court doesn't ever tell the jury how to consider things. It may limit their consideration. It may give them caution about informants or, in this case, the particular situation. Actually, the court recited the defense theory to the jury at this point. I thought he was gonna do it later, but he did it right at that point. So the jury was well aware of the issue and what the concern should be about accepting this testimony. One further point is that it's argued here today that Davis was the whole government's case. Well, certainly against Marfoe, and that certainly isn't the case. There's Marfoe against Marfoe, Marfoe offering to kill Mr. Copeland in addition to having decided at one point during the preparation of this that he had killed the person when he was arrested with a guy named Styron, earlier in the conspiracy. There's his taped meeting where he acknowledges he was at this meeting with Davis and Byrd before the murder. There was also Copeland, Copeland who Davis could have but did not exonerate. Now, if they can explain, if the defense could explain why a person would incriminate himself and then target Marfoe as the person to throw under the bus, not to give the government even more, but throw Copeland under there as well, and it's the same argument we made to the jury, then we all should be listening to that. But that is not what happened. Copeland, and I'm sorry, Davis had the indicia of a person telling the truth. And in the Colvin case, when the court was considering, this court was considering 801 D1B, and whether or not to accept it, it gave some considerable weight to the fact that this person, this previous consistent statement was a statement in which the defendant did not exonerate himself or exculpate himself, but incriminated himself. And that makes it more reliable even today. And that's certainly what Davis did. Incriminated himself from the get-go as the most important player in all of this. I'm not hearing any questions, and I don't know if I should go any further, but I point to the court, I think it's clear from our brief, is that this motive to go to a lawyer is not the same thing as a motive to fabricate. And fabrication typically means a self-serving statement. And we're not seeing here self-serving statements. This was a person seeking lawyer advice, got it, and the government was able to exploit it. A rare thing, certainly, but something we're able to do in this case. Any members of the court have any questions at this point? Thank you. First of all, Mr. McPherson. Yes, Your Honor. Remember, it's the defense theory of when and why the declarant is fabricating that is your focus point. And that focus point is before he goes to Murphy.    He's not going to be able to go to Murphy. If Murphy wasn't an attorney, we would still be in the same position. But because Murphy is an attorney and a very reputable one, who the government elicited his entire career background, that goes to Judge Hamilton's question about the error. The error is because Murphy gives credibility to Davis like no one else can. They're at the opposite ends of the credibility spectrum. And without Murphy, Davis is virtually worthless. And so the question is... What about Copeland? Well, everything that counsel just told you that Copeland testified to is Copeland repeating what he was told by Davis. Have they shown you anywhere in the record where Copeland said, I heard this from the horse's mouth? No, he only met... Is there evidence that Davis knew he was being recorded when he talked to Copeland? No, there is not. But it was a five-month period. These two were thick as... And they are thieves. And it is not inconceivable that Copeland made it known at some other time he wasn't wired or in some other way. But remember, this guy Davis, he used Feldman to get confidential information, to keep his underlings silent, not for legal services. So it's not unthinkable that he would also see Murphy the same way. But it doesn't matter whether or not it was Murphy or the next-door neighbor. But Murphy gives credibility that no one else can. He elevates Davis up to where the jury can be willing to purchase. Because there's no forensic, there was no eyewitness, there was no confession, there wasn't even circumstantial evidence. Well, sure there was. I mean, he was... He, first of all, wanted to do the killing himself... Based on Davis. ...and insisted on that. And wasn't there a tape that recording him? No. How about his presence at the discussions with Byrd? Okay, good question. That was disputed. And remember, when Copeland testified... I'm sure everything was disputed. Right, but when Copeland testified, he was asked three times who was with him at that meeting. He didn't say Marfell. It took counsel four questions to get Copeland to add Marfell into that meeting. Four questions. So, that's good. But he wasn't just describing what he saw and heard. Everything Copeland said came from Davis. Everything Murphy said came from Davis. Everything everyone said came from Davis. And the only time... And I guess you made all these arguments to the jury, that Davis was conniving and incredible, and that you should not convict on his basis. Trial court did not put the emphasis on it like I would have. Well, I understand. But the jury, that's... You're describing the epitome of a jury function. These arguments are jury arguments, that who's credible and who's not credible, and what the jury relied on, and who was the most truthful. Of course. And think how those arguments would have been if Murphy had not been allowed to testify to this. What would the government have argued as to why they should believe Davis? Because he said he was more culpable? It doesn't matter. He's got a plea deal. He can say... And the jury knew that. Right. And this is the way criminal cases are prosecuted. As a matter of fact, this is a particularly exemplary case where had every one of these guys gotten together and agreed to be quiet, probably nothing would have happened. But they broke down a different Copeland, and they all... You know, when the law starts coming, they start running and cut their deals. But that's the way the process works. It's not perfect. With all due respect, you're making the assumption that they believed Davis because of what Davis said. They could have only believed Davis. It's not that simple a question. Credibility is a very, very subtle... It is. ...thing and a fact-finder. And I was a district judge for a little while, and I know that what happens in the courtroom is something that doesn't show on the record. But the juries make these decisions. They watch everything. Sure, but in the absence of an eyewitness, of forensic, of confession, of something from somewhere other than Davis himself, then it becomes critical that Davis's testimony only be evaluated for credibility by admissible evidence. Were you trial counsel below? No. Well, wasn't Davis very aggressively cross-examined on his testimony? He was. That was... He was. Unfortunately, I don't think the closing matched up with the cross-exam, but it was a very thorough cross-exam. That's why they needed Murphy. Without Murphy, there's nothing for Davis. Tell me how Murphy's testimony was preserved by the attorney for Murphy, preserved for their error analysis? It wasn't preserved. So we're on plain error. But, I'm sorry, did I... Well, can it survive plain error analysis? My question is, how was the testimony preserved for plain error analysis? Yeah. There was no objection. So there was no preservation? There was no preservation. And that's why... Well, doesn't it end right there? No. No. That's why we look at whether or not the error was clear. It was clear because the government agrees that the pre-motive existed. Then we look at substantial effect the defendant's right. Some error occurs during this proceeding, and the defendant doesn't raise any objections to it that it's preserved for plain error analysis? Yes. What? Yes. And what's I... Yes, I said. Under what theory is that? It wasn't... He waived it. If it's not preserved for plain error analysis, he waived it. I... Plain error, you look at it, if it wasn't preserved, to determine whether or not it was a clear error that substantially affected the right... What you're asking us to do is to go back and review all of this to see if there was plain error. And if there was plain error, if it was reserved, preserved for plain error review, or if it was harmless, or if it was invited. And it wasn't harmless because since everything goes back to Davis, there's a reasonable probability that the verdict would have been different. Once you take... You want us to make those objections for what should have happened in the trial coun... where trial counsel below. We... Tell me how we can do that. We... You look at the record as a whole, as you just said, to see whether or not that error is clear. All right. Thank you. All right. Thank you, Mr. McPherson. I know you were court appointed. Yes, may I... Okay. Am I over? Yes. I'm sorry. Yeah. Yeah, the light turned off. Okay. You were court appointed, were you? Yes. I want to recognize that service and your forceful arguments. Mr. Gardner, was he a part of your... Yes, I... You brought him on to help. Yes. Thank you, Mr. Gardner. We'll come down and greet counsel after adjourning for the day. This honorable court stands adjourned until tomorrow morning at 9.30. God save the United States and this honorable court.
judges: Paul V. Niemeyer, G. Steven Agee, Clyde H. Hamilton